Nos. 19-10105-HH &19-10122-HH

In the
# United States Court of Appeals
## for the Eleventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

PRINCE TOBURAS ROLLE,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NOS. 6:09-CR-103-ORL-31GJK-1 & 6:17-CR-301-ORL-31GJK-1

## CONSOLIDATED BRIEF OF THE UNITED STATES

MARIA CHAPA LOPEZ
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

LINDA JULIN MCNAMARA
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 714887
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

October 4, 2019

*United States v. Prince Toburas Rolle*
Nos. 19-10105-HH & 19-10122-HH

## Certificate of Interested Persons and Corporate Disclosure Statement

In addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement in Prince Toburas Rolle's principal brief, the following persons have an interest in the outcome of this case:

1.    Albritton, A. Brian, former United States Attorney;

2.    Cream, Anita M., Assistant United States Attorney;

3.    McNamara, Linda Julin, Assistant United States Attorney, Deputy Chief, Appellate Division; and

4.    O'Neill, Robert E., former United States Attorney.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## Statement Regarding Oral Argument

The United States does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument ................................................................. i

Table of Contents ............................................................................................. ii

Table of Citations ........................................................................................... iv

Statement of Jurisdiction .............................................................................. vii

Statement of the Issues ................................................................................... 1

Statement of the Case ...................................................................................... 1

    *Course of Proceedings* ................................................................................ 2

    *Statement of the Facts*................................................................................ 3

        A.    The Facts of Rolle's Offense and Supervised-Release
               Violation ........................................................................... 3

        B.    The Proceedings on the Supervised-Release Violation, on
               Rolle's New Charges, and on Rolle's Attorney's Criminal
               Charge ............................................................................. 7

        C.    The Post-Trial Proceedings ............................................. 19

    *Standard of Review* ................................................................................. 29

Summary of the Argument ........................................................................... 30

Argument and Citations of Authority ......................................................... 31

    I.    Because Rolle's counsel did not entirely fail to subject the
       United States' case to meaningful adversarial testing, Rolle
       cannot show structural error in the proceedings .......................... 31

II.    The district court did not clearly err in finding at sentencing that Rolle's high-speed flight from law-enforcement officers had recklessly created a substantial risk of death or serious bodily injury to another.............................................................. 43

Conclusion................................................................................................. 47

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Arizona v. Gant,*
  556 U.S. 332 (2009) ................................................................. 30

*\*Bell v. Cone,*
  535 U.S. 685 (2002) ..................................................... 33, 34, 42

*Brewster v. Hetzel*,
  913 F.3d 1042 (11th Cir. 2019) ........................................... 39, 40

*\*Castillo v. Fla., Sec'y of DOC*,
  722 F.3d 1281 (11th Cir. 2013) ........................................... 30, 36

*Chanthakoummane v. Stephens,*
  816 F.3d 62 (5th Cir. 2016) ....................................................... 38

*Cuyler v. Sullivan,*
  446 U.S. 335 (1980) ................................................................. 40

*Downs v. Sec'y, Fla. Dep't of Corr.*,
  738 F.3d 240 (11th Cir. 2013) .................................................. 40

*\*Florida v. Nixon,*
  543 U.S. 175 (2004) ................................................................. 34

*Harvey v. Warden, Union Corr. Inst.*,
  629 F.3d 1228 (11th Cir. 2011) ........................................... 32, 35

*\*Mickens v. Taylor*,
  535 U.S. 162 (2002) ............................................................ 40, 41

*Powell v. Alabama*,
  287 U.S. 45 (1932) ................................................................. 34

*\*Roe v. Flores-Ortega*,
  528 U.S. 470 (2000) ................................................................. 35

iv

*Stano v. Dugger,*
    921 F.2d 1125 (11th Cir. 1991) (en banc) .................................................. 35

*\*Strickland v. Washington,*
    466 U.S. 668 (1984) ...................................................... 32, 33, 35, 36

*Tueros v. Greiner,*
    343 F.3d 587 (2d Cir. 2003) ........................................................ 36

*\*United State v. Gonzalez,*
    71 F.3d 819 (11th Cir. 1996) ............................................................30, 44

*\*United States v. Cronic,*
    466 U.S. 648 (1984) .................................................... *passim*

*United States v. Davis,*
    734 F. App'x 718 (11th Cir. 2018) ........................................................ 45

*United States v. Pardo-Gerena,*
    621 F. App'x 607 (11th Cir. 2015) ........................................................ 46

*\*United States v. Roy,*
    855 F.3d 1133 (11th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 1279
    (2018)........................................................................34, 35

*\*United States v. Washington,*
    434 F.3d 1265 (11th Cir. 2006) ............................................................ 45

*Woodard v. Collins,*
    898 F.2d 1027 (5th Cir. 1990).................................................... 36

## Statutes

18 U.S.C. § 922(g)(1) ................................................................ 2

18 U.S.C. § 3231 ................................................................ vii

18 U.S.C. § 3553(a) ................................................................ 27

18 U.S.C. § 3742(a) ................................................................ vii

21 U.S.C. § 841(a)(1) ............................................................ 2

28 U.S.C. § 1291 .............................................................. vii

28 U.S.C. § 2254 .............................................................. 33

**Rules**

Fed. R. App. P. 4(b) .......................................................... vii

**Other Authorities**

USSG §3C1.2 ............................................................ *passim*

USSG §4B1.1 ................................................................ 21

USSG §5H1.9 ............................................................26, 42

# Statement of Jurisdiction

These are consolidated appeals from final judgments of the United States District Court for the Middle District of Florida in two criminal cases, case no. 6:09-cr-103-Orl-31GJK-1 (involving a violation of the terms of Prince Toburas Rolle's supervised release in that case) and case no. 6:17-cr-301-Orl-31GJK-1 (involving the new criminal charges arising from the conduct that constituted Rolle's supervised-release violation).[1] That court had jurisdiction in both cases, *see* 18 U.S.C. § 3231, and entered both judgments on January 8, 2019, *see* Doc. 141 (103); Doc. 125 (301). Rolle timely filed notices of appeal that same day. Doc. 142 (103); Doc. 127 (301); *see* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal, *see* 28 U.S.C. § 1291, and authority to examine Rolle's challenge to his sentence, *see* 18 U.S.C. § 3742(a).

---

[1] In this brief, we refer to the docket entries in Case No. 6:17-cr-301 as "Doc. ___ (301)," and to the docket entries in Case No. 6:09-cr-103 as "Doc. ___ (103)."

## Statement of the Issues

I.      Can Rolle show structural error in the proceedings although his counsel did not entirely fail to subject the United States' case to meaningful adversarial testing?

II.     Did the district court clearly err in finding at sentencing that Rolle's high-speed flight from law-enforcement officers had recklessly created a substantial risk of death or serious bodily injury to another?

## Statement of the Case

While Price Toburas Rolle was serving a term of supervised release for federal drug offenses, he violated the conditions of that release by possessing fentanyl and a gun. Consequently, he faced both new federal criminal charges and a charge that he had violated the conditions of his supervised release. Attorney Nicole Dickerson represented him in both proceedings. In this appeal, Rolle contends that Dickerson's poor performance resulted in structural error in both cases. He also challenges the district court's application of a two-level sentence enhancement for reckless endangerment to others, which the court based on his high-speed vehicular flight from law-enforcement officers.

1

*Course of Proceedings*

On January 13, 2017, Rolle began serving a term of supervised release following his release from imprisonment for two federal drug-crime convictions. Doc. 152 at 3 (103). But, on September 27, 2017, he committed new crimes, Doc. 152 at 3–4 (103), and, on October 19, 2017, he was arrested on a charge that he had violated the conditions of his release, Doc. 101 (103). That case was assigned to District Judge John Antoon II, who ultimately found that he had violated the conditions of his supervision. Doc. 166 at 24 (301).

On December 20, 2017, a federal grand jury in the Middle District of Florida returned an indictment charging Rolle with the crimes that were the subject of his supervised-release violation—possession of fentanyl with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm and ammunition after having been convicted of two crimes punishable by imprisonment for more than one year, in violation of 18 U.S.C. § 922(g)(1). Doc. 1 (301). That case was assigned to District Judge Gregory A. Presnell. After juries were unable to reach a verdict at his first two trials, a third jury found him guilty of those charges. *See* Doc. 57 at 6 (301); Doc. 87 at 10 (301); Doc. 164 at 160 (301).

The district court sentenced Rolle to serve 210 months' imprisonment on

the new charges, to be followed by 24 months' imprisonment for his supervised-release violation. Doc. 166 at 20–21, 26 (301). This appeal followed. Doc. 142 (103); Doc. 127 (301).

*Statement of the Facts*

**A.   The Facts of Rolle's Offense and Supervised-Release Violation**

Orlando Police Officer Joel Williams is a member of the police department's Tactical Anti-Crime Unit ("TAC Unit"). Doc. 160 at 146 (301). On September 27, 2017, he was working in an unmarked car in the late afternoon when he saw a light-blue Hyundai Sonata commit several traffic infractions. Doc. 160 at 150–51, 154 (301); Doc. 162 at 84 (301). He could see that the Sonata's driver was a young, black male with short hair and a goatee. Doc. 160 at 151 (301).

Officer Williams checked the car's tag number and discovered that it was a rental car. Doc. 160 at 152 (301). Because the car's windows were very darkly tinted and rental cars generally do not have tinted windows, Officer Williams became suspicious and decided to conduct a traffic stop. Doc. 160 at 152 (301). He followed the Sonata in his unmarked car and, as he does for every traffic stop, he requested assistance from another TAC Unit Officer. Doc. 160 at 153 (301). Officer Zachary Evans was nearby, and his car had a GPS tracking system onboard called "StarChase" that could be used to safely

3

track a fleeing vehicle.[2] Doc. 160 at 153–54 (301); Doc. 162 at 82–84 (301).

Within two minutes, Officer Evans and his partner responded to the area

where the Sonata was driving, pulled up behind it, deployed the StarChase

system, and activated their car's red and blue lights and siren. Doc. 160 at 154–

55 (301); Doc. 162 at 38, 84, 162 (301). Instead of pulling over, however, the

Sonata sped away, accelerating "at an extremely high rate of speed." Doc. 162

at 91–92 (301); *see also* Doc. 160 at 154 (301); Doc. 162 at 84 (301).

The officers allowed the Sonata to drive away without chasing it, but,

using the StarChase system, all of the TAC Unit officers in the area tracked the

Sonata by GPS and communicated with each other by radio. Doc. 160 at 155–

58, 163 (301); Doc. 162 at 40, 86–87 (301). (A recording of their

communications was admitted into evidence at trial, Doc. 160 at 189–95 (301),

as was a computer-aided dispatch report showing all of the units that

responded to the incident, *see* Doc. 162 at 7–22 (301); Gov't Ex. 19.) Once it

appeared to the officers that Rolle thought he had eluded the police and had

slowed down to a normal speed, Officer Williams in his unmarked car began

following the Sonata again. Doc. 160 at 160–61 (301).

---

[2]An officer deploys the StarChase system by pulling up behind a vehicle and shooting darts from the patrol car's front that adhere to the back of the other vehicle. Doc. 162 at 85 (301). The darts connect to a satellite and enable officers to follow the vehicle via GPS. Doc. 162 at 85 (301).

Officer Williams then saw a black bag fly out of the Sonata's passenger-side window and land in a grassy area on the side of the road. Doc. 160 at 161 (301). Officers later found that the bag was a Gucci backpack containing a loaded .45-caliber semiautomatic pistol, an electronic scale, a spoon, a baggie containing 47 grams of fentanyl, and a baggie containing 166 grams of the synthetic stimulant Molly. Doc. 160 at 169–71, 184–85 (301); Doc. 162 at 106–08 (301).

Eventually, the Sonata drove to the Grand Reserve apartment complex in Maitland, and the driver parked. Doc. 160 at 164 (301). Officer Williams saw the driver get out of the car, and he pulled up behind the Sonata. Doc. 160 at 164–65 (301). The driver looked at Officer Williams and then took off running through the complex. Doc. 160 at 165 (301). Officer Williams got out of his car and chased the driver on foot, identifying himself as Orlando police and ordering him to stop. Doc. 160 at 165–66 (301). As the driver was running, Officer Williams saw the driver reach into his pocket and then discard a black cellphone onto the grass. Doc. 160 at 166 (301).

As the chase continued, Officer Williams lost sight of the driver and thought that he either had entered an apartment or was continuing to run through the complex. Doc. 160 at 167–68 (301). So TAC Unit members set up a perimeter around the building in which Officer Williams thought he might be

5

hiding. Doc. 160 at 167–68 (301).

Officers who had responded to the scene went door-to-door throughout the complex to see if anyone had seen a person matching the driver's description, but no one was able to help. Doc. 160 at 173–74 (301). So Officer Williams returned to the Sonata to see if he could find anything that would identify the car's driver. Doc. 160 at 174 (301). Inside the car, he found a rental agreement in Rolle's name. Doc. 160 at 174. (301)

Officer Williams searched the name on his patrol car's computer and found Rolle's personal identification information and photo, and he immediately recognized Rolle as the person he had seen driving the Sonata. Doc. 160 at 175–76 (301); *see* Doc. 160 at 151–52 (301). Officer Williams showed the photo to management and maintenance personnel at the complex, but no one recognized him. Doc. 160 at 177 (301). Having been unsuccessful in finding Rolle, the officers all left the complex by about 6:00 p.m. Doc. 160 at 179 (301).

Around 9:00 p.m. that evening, Orange County Sheriff's Deputy Adam Villar responded to a report that had come in at about 7:35 p.m. about a stolen rental car. Doc. 162 at 138–39 (301). When he arrived at the reported location, Rolle and a woman were standing outside. Doc. 162 at 139 (301). Rolle described the stolen car as a rented, light-blue Hyundai Sonata. Doc. 162 at

6

139–40 (301). He said that he had gone to his cousin's house to play cards that day at about 3:45 p.m. and had noticed that the keys to the car were missing about an hour and 15 minutes later. Doc. 162 at 140 (301). He claimed that he then had gone outside and had found that the car was gone. Doc. 162 at 140–41 (301).

Cell-tower location information for a phone that Rolle regularly used, however, showed that that phone had been in the vicinity of the foot chase through the apartment complex at the time of that event. *See* Doc. 162 at 228–34 (301); Gov't Ex. 17A.

**B.    The Proceedings on the Supervised-Release Violation, on Rolle's New Charges, and on Rolle's Attorney's Criminal Charge**

Rolle's initial appearance on the supervised-release-violation charge occurred on October 31, 2017, with the Federal Public Defender representing him. *See* Doc. 102 (103). A few days later, though, Dickerson, whom Rolle had retained, entered an appearance on Rolle's behalf. Doc. 107 (103).

Dickerson also appeared on Rolle's behalf and entered a not-guilty plea for him at his December 22, 2017, initial appearance on the new federal criminal charges. Doc. 151 at 2, 5 (301). On that same day, a magistrate judge entered an order scheduling Rolle's trial for the trial term beginning February 5, 2018. Doc. 10 at 7 (301).

7

Dickerson had been arrested herself a month earlier, on October 7, 2017, as a result of an altercation with Orlando TAC Unit officers Stanley Avignon and Landon Thomas during a traffic stop. *See* Addendum A to Rolle's brief at 66–67.[3] On November 2, 2017, the State of Florida charged Dickerson by complaint with resisting an officer without violence. Addendum A to Rolle's brief at 69.

Meanwhile, Rolle's new case proceeded toward trial. At a January 5, 2018, status conference, Dickerson moved to continue the trial until March 2018. Doc. 142 at 5 (301). The district court granted the motion, and scheduled the next status conference for February. Doc. 142 at 5 (301).

That status conference occurred on February 13, but Dickerson did not appear. *See* Doc. 156 at 2 (301). The court conducted the brief conference in her absence, stating that the case would be tried sometime in March. Doc. 156 at 2 (301). A week later, the court set Rolle's trial for March 26. Doc. 17 (301).

On March 8 and 9, Dickerson was tried and convicted in an Orange County, Florida, court on her resisting-an-officer charge. *See* Addendum A to Rolle's brief at 70–71. Officers Avignon and Thomas testified at that trial. *See id.* The court sentenced Dickerson to serve ten days in Orange County Jail, but

---

[3]For ease of reference, when we refer in this brief to documents appended to Rolle's brief, we use the page number set forth on the header to the addendum.

8

the court suspended her sentence on the condition that she serve 100 hours of community service. *See* Addendum A to Rolle's brief at 72–74.

The district court conducted Rolle's next status conference in Rolle's case on March 13. *See* Doc. 145 (301). During the conference, Dickerson asked the court to continue the trial again, until April, saying that she anticipated that Rolle would be changing his plea. Doc. 145 at 2 (301). The court agreed to move the trial to April 23 but warned Dickerson that, if Rolle had not changed his plea by seven days before that date, the court would not accept a plea agreement and Rolle would have to plead "straight up" if he did not want to go to trial. Doc. 145 at 2 (301).

On April 9, the court scheduled a change-of-plea hearing for Rolle for April 13. Doc. 25 (301). But, on April 12, the court cancelled that hearing because Rolle decided to go forward with the trial. Doc. 27 (301).

On Monday, April 23, the parties appeared for trial. *See* Doc. 147 (301). Dickerson, however, told the court that, on the previous Thursday and Friday, the United States had given her previously undisclosed discovery and that she had not had sufficient time to subpoena witnesses who might be able to present exculpatory evidence relating to that discovery. Doc. 147 at 5–6 (301). Apologizing to the court for the late notice, she requested the court to continue the trial for at least another week to give her an opportunity to subpoena those

9

witnesses. Doc. 147 at 6–7 (301). One of the items that she had just received was a report showing that a latent fingerprint found on the cellphone that the suspect had thrown down at the time of the offense did not belong to Rolle, and she requested an opportunity to determine whose fingerprint that was. Doc. 147 at 9–10 (301). She argued that that information might be "extremely exculpatory for Mr. Rolle." Doc. 147 at 9 (301). She also explained the additional preparation she needed to do with respect to the other items that the United States had recently disclosed. Doc. 147 at 9–17 (301).

The district court ruled that the case was not ready for trial, saying, "[N]otwithstanding who is to blame for it, we're not ready for trial with all this new information having been disclosed one or two business days ago, so I have no option but to grant defendant's motion." Doc. 147 at 19 (301). Dickerson asked for a continuance until the end of May, the court asked Rolle if he agreed with that request, and Rolle said that he did. Doc. 147 at 19–20 (301). The court, therefore, continued the trial until May 29. Doc. 37 (301).

Rolle's trial began as scheduled and proceeded as trials usually do, with Dickerson exercising all of her peremptory challenges, presenting an opening statement raising a defense of mis-identification, asserting appropriate objections, conducting voir dire as to certain witnesses and evidence, cross-examining witnesses as to their ability to identify Rolle as the person who had

10

committed the charged crimes, moving for a judgment of acquittal, presenting a closing argument, and doing all of the things that lawyers ordinarily and appropriately do at trial. *See* Docs. 53, 55, 57 (301). Although she was 12 minutes late to court on the morning of the second day of the trial, she apologized and explained to the court that she had been delayed by traffic and weather in dropping off her children at school, which had caused her to be late to court. Doc. 55 at 6, 235–36 (301).

Ultimately, the jury was unable to reach a verdict, so the district court declared a mistrial. Doc. 57 at 6–7 (301). The court suggested retrying the case in July, but Dickerson asked the court to schedule the trial sooner, given that Rolle was incarcerated. Doc. 57 at 7 (301). The court set the new trial for June 19. *See* Doc. 52 (301).

On June 18, Dickerson filed Rolle's witness list, naming 26 potential witnesses. Doc. 60 (301). Most of the witnesses were law-enforcement officers from the TAC Unit who were named on the computer-aided dispatch report and who had responded to the chase through the apartment complex. *See* Doc. 60 (301); Doc. 81 at 7 (301). That list included Officers Avignon and Thomas—the two officers who had conducted Dickerson's traffic stop the previous October and who had been involved in the incident with her. *See* Doc. 60 (301); Addendum A to Rolle's brief at 67–68. It also included their

11

supervisor, Sergeant Wesley Whited, who had been advised of the incident. *See id.*

When the second trial convened on the morning of June 19, the United States complained that Rolle's identification of so many police officers as potential witnesses was taking a large number of officers out of duty for the duration of the trial. Doc. 81 at 6 (301). Dickerson assured the court that she had contacted the officers to tell them when they might be called as witnesses, and she explained her basis for naming them as witnesses—several of them had been involved in the lock-down of the apartment complex. Doc. 81 at 7 (301). The district court ruled that it would be an abuse of process for Dickerson to subpoena every officer named on the dispatch report. Doc. 81 at 8 (301). Later that day, Dickerson told the court that she had spoken with and excused many of the listed officers. Doc. 81 at 98–99 (301).

As the trial continued, Dickerson proceeded largely as she had done during the first trial, presenting an opening statement, asserting appropriate objections, conducting voir dire of witnesses at appropriate times, and cross-examining the witnesses regarding their ability to identify Rolle, investigators' failure to connect a fingerprint on the cellphone to Dickerson, and other things. *See* Docs. 81, 83, 85 (301). Dickerson also called several witnesses to testify, including Rolle's fiancée Alexandra Charles, who testified that Rolle

12

had told her that day that he thought his rental car had been stolen.[4] Doc. 83 at 250–57 (301).

The jury retired to deliberate at 10:42 a.m. on the third day of the trial but was unable to reach a verdict that day. Doc. 85 at 53, 55 (301). It resumed deliberating the next day. *See* Doc. 87 (301). When it became apparent that the jury was again struggling to reach a verdict, the court said:

> Just to give you a heads-up, if there's another hung jury in this case, I don't know what the Government's going to do. I would encourage you to dismiss the charges, but in any event, it's my thought that Mr. Rolle should be released on bond. If there are two juries that can't convict him, I don't see the point of holding him for another trial.

Doc. 87 at 8 (301). The United States reminded the court that Rolle was also being held as a result of his violation of the terms of his supervised release, but the court said, "I think it should be at least reviewed." Doc. 87 at 8 (301).

The jury continued to deliberate that morning but again was unable to reach a verdict. Doc. 87 at 10 (301). Consequently, the court declared a mistrial a second time. Doc. 87 at 10–11 (301). Addressing Dickerson, the court said, "And with respect to bail, if you want to make an application for release, file your motion, and it'll be referred to the magistrate judge, and that'll get resolved appropriately in that fashion." Doc. 87 at 12 (301).

---

[4]Charles had testified at the first trial, too. *See* Doc. 55 at 171 (301).

On June 25, Dickerson filed a motion requesting Rolle's release from pretrial detention, as the district court had suggested. Doc. 71 (301). Magistrate Judge Gregory J. Kelly conducted a hearing on Rolle's motion three days later. Doc. 153 (301). At the start of the hearing, the United States noted that Magistrate Judge Thomas B. Smith had already ordered Rolle's detention for his supervised-release violation and asserted, therefore, that Rolle should not be released, Doc. 153 at 2–3 (301); *see* Doc. 112 (103). Magistrate Judge Kelly noted that, even if he ordered Rolle's release in the case involving the new charges, Rolle would remain detained in the other case. Doc. 153 at 4–5 (301). Dickerson, therefore, elected to withdraw Rolle's motion and take it up first with Magistrate Judge Smith. Doc. 153 at 6, 8 (301).

She did that on July 12, moving for Rolle's release in the supervised-release proceeding. Doc. 120 (103). Magistrate Judge Smith conducted a hearing on that motion on July 18. Doc. 154 (103). Although finding that Rolle's argument had "some appeal," the magistrate judge ruled that Rolle had not shown by clear and convincing evidence that he should be released and, therefore, denied Rolle's motion. Doc. 154 at 11–13 (103).

The district court conducted the next status conference in Rolle's case on August 14, and Dickerson was not there when court convened. Doc. 158 at 2 (301). Another attorney who was present in the courtroom stepped in on

Rolle's behalf to discuss setting the date for the third trial. Doc. 158 at 2–3 (301). The court decided, however, to call Dickerson to determine why she was not there. Doc. 158 at 4 (301).

When the court reached Dickerson by phone, she apologized for her failure to appear, saying: "I thought this case was just reset for trial. I honestly did not see that it was set for a status, so I sincerely apologize." Doc. 158 at 4–5 (301). The court set the trial for September 4. Doc. 158 at 5–6 (301).

Rolle's third trial began on that date. Doc. 160 (301). The United States complained again that Rolle's witness list identified many law-enforcement officers who could not provide any relevant testimony. Doc. 160 at 4–5 (301). The United States also alerted the court that Dickerson had included Rolle's fiancée Alexandra Charles on the list although she was under investigation for perjury based on her testimony at the second trial. Doc. 160 at 5 (301).

The court noted that Dickerson had arrived late that morning and warned her that the court would not overlook her tardiness in the future. Doc. 160 at 5 (301). And, responding to the United States' complaint about Rolle's witness list, the court said: "I don't understand subpoenaing all these police officers you're not going to call. Unless you've got a good explanation, I'm going to have to start imposing sanctions." Doc. 160 at 5 (301). Dickerson insisted, however, that all of the listed officers had information that was

relevant to the case as they had all responded to the September 27 incident and had participated in locking down the apartment complex. Doc. 160 at 5–6 (301). She assured the court that she had communicated with all of the officers and had told them that she would notify them if they would be needed to testify. Doc. 160 at 6 (301). She said that she had already released some of them. Doc. 160 at 6 (301).

 With respect to her inclusion of Charles on Rolle's witness list, Dickerson explained that thousands and thousands of new phone records that the United States had recently produced in discovery were all in Charles's name and were not associated with Rolle. Doc. 160 at 7–8 (301). The court ruled that Charles could testify and that the court would address any objections regarding her testimony at the appropriate time. Doc. 160 at 8 (301).

The court then proceeded with voir dire for the third trial, during which Dickerson exercised appropriate challenges to members of the venire. Doc. 160 at 10, 77–78, 83, 119–20, 122–25 (301). For the third time, Dickerson gave an opening statement, raising a mis-identification defense. Doc. 160 at 141–45 (301). And the trial proceeded much as the first two had. *See* Doc. 160 at 145–204 (301).

On the second morning of the trial, the court convened at 8:30 a.m., and Dickerson arrived one minute late at 8:31 a.m., explaining that she had had a

16

"small issue" with her staff the previous day and was "running alone" that day. Doc. 162 at 4 (301). The court fined her $100 for her tardiness. Doc. 110 (301); Doc. 162 at 4 (301).

The court then addressed the "issue" to which Dickerson had referred, telling her that, on the previous day, Dickerson's assistant had been using a cellphone in the courtroom to send personal text messages, which violated the court's standing order. Doc. 162 at 4–5 (301). The court said that the assistant had refused to turn over the phone or her identification when asked and had called the security officer a "fucking asshole" when he had stopped her from reentering the courtroom. Doc. 162 at 5 (301). The assistant had been escorted from the courthouse and had been told not to return unless the court ruled otherwise. Doc. 162 at 5 (301). Dickerson assured the court that she had spoken with that staff member and had addressed the issue with her and that the staff member would not be returning to court. Doc. 162 at 5–6 (301). The trial resumed thereafter, with Dickerson raising objections, conducting voir dire of witnesses, and cross-examining the United States' witnesses. Docs. 162, 164 (301).

On the third day of the trial, the court addressed Rolle directly to ensure that he understood his right to testify in his own behalf. Doc. 164 at 66 (301). The court asked Rolle whether he had discussed with Dickerson whether he

17

should testify, Rolle replied, "Yes, sir," and the court asked Rolle whether he had been satisfied with Dickerson's representation of him in the case. Doc. 164 at 66 (301). Again, Rolle replied, "Yes, sir." Doc. 164 at 66 (301). He elected not to testify. Doc. 164 at 98–99 (301).

After the United States had rested, Dickerson began to call witnesses in Rolle's defense. Doc. 164 at 67–68 (301). As she had done at the previous trials, she questioned several law-enforcement witnesses, including Officer Avignon, about their inability to identify Rolle. *See* Doc. 164 at 85–92 (301). She questioned a records custodian for the Orange County Sheriff's Office and Deputy Villar about Rolle's report that the Sonata had been stolen. *See* Doc. 164 at 69, 93–97 (301). She questioned the apartment complex's property manager about the fact that she had told investigators that one of the complex's residents matched the description of the person who had been the subject of the chase. Doc. 164 at 74 (301). And she questioned Rolle's federal probation officer about the cellphone number that Rolle regularly used. Doc. 164 at 102–07 (301). She did not call Charles to testify. *See* Doc. 164 at 98 (301).

The court then instructed the jury, and Dickerson and counsel for the United States presented their closing arguments. Doc. 164 at 111–58 (301). As Rolle notes in his brief, Dickerson did not move for a judgment of acquittal.

18

After deliberating for less than two hours, the jury returned its verdict finding Rolle guilty as charged. Doc. 164 at 159–60 (301).

## C.    The Post-Trial Proceedings

The next day, September 7, Judge Antoon transferred the violation-of-supervised-release case to Judge Presnell so that he could preside over the two related cases. Doc. 125 (103).

On September 10, Judge Presnell entered an order directing Dickerson to appear before the court on September 18 to show cause why the court should not impose sanctions for her assistant's violation of the court's standing order during Rolle's trial. *See* Addendum A to Rolle's brief at 77–78. The court directed Dickerson to bring her employee with her to the hearing. *Id.*

Dickerson failed to appear for the hearing, and also failed to pay the $100 fine that the court had imposed for her tardiness to trial. *See id.* at 84; *see also id.* at 87–90. The district court, therefore, referred the matter to the United States Attorney's Office for a criminal-contempt investigation. *Id.* at 84–85. That matter, *United States v. Dickerson,* Case No. 6:18-cr-215, Middle District of Florida, was assigned to District Judge Roy B. Dalton.

On September 21, the state court in Dickerson's resisting-an-officer case conducted a hearing and found that Dickerson had failed to complete her 100 hours of mandatory community service. *See* Addendum A to Rolle's brief at

19

75. The court ordered Dickerson to serve eight days in the Orange County Jail, she served that sentence, and she was released from custody on September 27. *Id.*; *see State v. Dickerson,* Case No. 2017-MM-009328-A-O, in the County Court of the Ninth Judicial Circuit in and for Orange County, Florida.

On October 2, Magistrate Judge Kelly conducted a final revocation hearing on the supervised-release-violation charge, with Dickerson representing Rolle. *See* Doc. 156 (103). At the hearing, the United States informed the magistrate judge that a jury had found Rolle guilty of the two crimes that were the basis for the supervised-release-violation charge and argued that that disposition constituted *res judicata* in the supervised-release case. Doc. 156 at 3 (103). Dickerson agreed with that assessment but told the magistrate judge that Rolle did not want to plead guilty. Doc. 156 at 4 (103). The magistrate judge agreed to take judicial notice of the verdict. *Id.* The magistrate judge thereafter entered a Report and Recommendation finding that Rolle had violated the conditions of his supervision and recommending that the district court enter an order to show cause why his term of supervised release should not be revoked. Doc. 132 (103). The district court entered that order later that day and scheduled a hearing for December 3. Doc. 133 (103).

The United States Probation Office prepared Rolle's Initial Presentence Investigation Report on October 29. *See* Rolle's Initial PSR; Doc. 113 (301). In

the Initial PSR, the probation office determined that Rolle had a total

guidelines offense level of 32 and a criminal history category of VI, Initial PSR

¶¶ 29, 55, for an advisory range of imprisonment of 210 to 262 months, Initial

PSR ¶ 89.[5] On November 21, Dickerson submitted a variety of factual and

legal objections and requested the court to depart downward from Rolle's

advisory guidelines range. *See* Rolle's Final PSR at 36.

Meanwhile, on November 16, District Judge Dalton had conducted a

status conference in Dickerson's criminal-contempt matter. *See* Addendum A

to Rolle's brief at 96. At the hearing, counsel for the United States told the

court that the United States Attorney's Office had concluded that it would be

unable to show that Dickerson's conduct with respect to the contempt

allegations had been willful. *Id.* at 98–99. Regarding Dickerson's failure to

appear at the September 18, hearing, the United States explained that the

investigation had shown that Dickerson's office had been so disorganized that

the United States could not show that Dickerson's conduct had resulted from a

willful violation of a court order rather than from a negligent oversight due to

---

[5]Because he had prior convictions for aggravated battery with a deadly
weapon and conspiracy to possess five grams or more of cocaine base with
intent to distribute it, Rolle qualified as a career offender under USSG §4B1.1.
*See* Final PSR ¶ 27. But he had an offense level of 32 and a criminal-history
category VI either with or without that enhancement. *See* Final PSR ¶¶ 26, 56.

poor organization of her office. *Id.* at 6–7.

Dickerson then addressed the court, explaining that she had not understood that her employee's possession of Dickerson's cellphone within the courtroom would violate the court's standing order with respect to phones. *Id.* at 103–05. Regarding her failure to appear for the September 18 hearing, she explained that, when her office had been served with the order to show cause, a member of her staff had placed it on her desk without opening it. *Id.* at 105. She said that she had not even known that any action was pending against her until a United States Deputy Marshal had served her with the order referring the case to the United States Attorney and setting the criminal-contempt proceeding for trial. *Id.* at 105. At that point, she and her assistant had found the original unopened envelope under some papers on her desk. *Id.* at 105–06. She said, "Had I known or had any idea of a court date, I absolutely would have been there." *Id.* at 106.

Dickerson also addressed the $100 fine that the district court had assessed her. *Id.* at 107. She explained that she had received an electronic notification of it during Rolle's trial and had "made a mental note to [her]self to go and check on that" but had neglected to do so. *Id.* at 107–08. She said that, on September 18 or 19, she had been served with a contempt order because of her failure to pay the fine on time and had gone to the clerk's office

to pay the fine with a credit card but had been told that she needed to pay with cash or a money order. *Id.* She said that she had paid the fine with cash on her next available opportunity, which had been October 1. *Id.*

Clearly perturbed with Dickerson, the court said, "So let me just take this opportunity to tell you, Ms. Dickerson, that it does not sound to me like you're qualified to practice in the United States District Court based on your current level of office organization or professionalism." *Id.* at 109. The court told Dickerson that it would refer the matter to the court's grievance committee to allow the committee members to look into her practice and to recommend whether her Bar privileges should be suspended or revoked. *Id.* at 109–10.

The court also determined that a finding of civil contempt was appropriate and that the court would decide later what would constitute an appropriate fine. *Id.* at 110. The court said, "I'm trying to find out what it would take to get your attention, and I'm concerned that even now the Court does not have your attention." *Id.*

As issues that concerned the court, the court noted that Dickerson had been "cavalier … about receiving a fine from the presiding judge," that she had not bothered to open her mail, and that she had not paid a fine until she had gotten around to it. *Id.* The court said that her conduct had been "stupefying

23

and unacceptable" and that the court was "not going to tolerate it." *Id.* The court said that it was not going to permit her to practice in that court until the court was convinced that she was going to "up [her] game." *Id.* at 111.

Asked if she had "any thoughts on the subject," Dickerson replied that she would "like to do whatever the Court wanted [her] to do." *Id.* The court asked her if she had done anything to rectify her staffing situation and to try to familiarize herself with the Court's practice rules, and Dickerson replied that she certainly had. *Id.* She explained the new systems that she had put in place at her office to ensure that she did not overlook mail or deadlines, she told the court how she had trained her employees, and she assured the court that she and her staff had reviewed the court's standing orders and local rules. *Id.* at 112.

The court asked Dickerson whether she had any pending matters in that court, and Dickerson said that she had two, including Rolle's upcoming sentencing. *Id.* at 113. The court then dismissed the criminal-contempt proceedings against Dickerson but said that it would be referring the matter to the court's grievance committee and would impose a sanction at a later time. *Id.* at 113–17.

District Judge Presnell conducted Rolle's sentencing hearing and final supervised-release revocation proceeding three weeks later, on January 7,

24

2019. *See* Doc. 166 (301). That morning, Dickerson filed four character letters on Rolle's behalf. Doc. 121 (301). During the hearing, she objected to the paragraphs in the PSR identifying Rolle as the perpetrator of the charged crime and to the suggested upward adjustments, which were based on his filing of a false police report, *see* Final PSR ¶¶ 15, 25, and on his reckless creation of a substantial risk of bodily injury by his flight from law enforcement officers, *see* Final PSR ¶¶ 13, 24; *see also* Doc. 166 at 4 (301).

Noting that the court had tried the case three times and was well aware of the facts, the district court overruled the objections to the description of the offense conduct. Doc. 166 at 6 (301). The court also found that a preponderance of the evidence supported the upward adjustments. Doc. 166 at 7 (301). The court, therefore, adopted the factual statements in the PSR and determined that the appropriate guidelines level was 32, with a criminal-history category of VI. Doc. 166 at 7 (301). The court noted that, although Rolle's advisory guidelines range was 210 to 262 months' imprisonment, the statutory-maximum sentence was 240 months' imprisonment. Doc. 166 at 7 (301).

Dickerson requested the court to depart downward from the advisory guidelines range based on Rolle's lack of reliance on criminal activity to earn a living. Doc. 166 at 9 (301). She explained that, after Rolle had been released on

bond, he "had taken pretty significant steps to try to turn his life around." Doc. 166 at 9–10 (301). She noted that his only two other adult convictions were ones that happened to qualify him as a career offender. Doc. 166 at 10 (301). She told the court that, while Rolle had been incarcerated for his 2011 convictions, his mother, stepfather, and grandfather, who were the only people who had been his source of guidance in his life, all had passed away. Doc. 166 at 10 (301). She described the steps he had taken since his release to turn his life around. Doc. 166 at 10–11 (301). And she noted that Rolle had not relied on criminal activity to do any of those things. Doc. 166 at 10–11 (301). She cited USSG §5H1.9 as a basis for a downward departure from the advisory guidelines range. Doc. 166 at 11–12 (301).

In response, the United States argued that the evidence had shown that Rolle had indeed depended on criminal activity for his livelihood. Doc. 166 at 12–13 (301). The district court agreed with the United States, saying: "[T]here's some evidence that Mr. Rolle was engaged in—in some legitimate efforts, but … the amount and type of drugs here far outweigh any legitimate effort to support oneself, and there's no evidence supporting that. So I don't believe that that's an appropriate departure." Doc. 166 at 13 (301).

After consulting with Rolle about whether he had any other information in mitigation to convey, Dickerson asked the court to sentence Rolle at the

bottom of the applicable guidelines range. Doc. 166 at 13 (301). Rolle then spoke in his own behalf, arguing, among other things, that he did not believe that he qualified as a career offender. Doc. 166 at 14 (301). He told the court that he wanted Dickerson to challenge that designation. Doc. 166 at 14 (301). The court explained to Rolle, however, that only his lawyer could assert legal objections to the PSR, that she had already done so, and that the court had overruled those objections. Doc. 166 at 15–16 (301). The court also noted that, regardless of the career-offender enhancement, Rolle's guidelines offense level and criminal-history category would be the same. Doc. 166 at 15 (301).

After the United States had explained its reasons for requesting a sentence within the advisory guidelines range, the district court discussed the 18 U.S.C. § 3553(a) factors and sentenced Rolle at the bottom of the range to serve 210 months' imprisonment, as Dickerson had requested. Doc. 166 at 20–22 (301).

The court then addressed Rolle's violation of the conditions of his supervised release. Doc. 166 at 23 (301). For the same reasons that she had objected to the PSR, Dickerson objected to the magistrate judge's Report and Recommendation advising the district court to find him guilty of violating the conditions of his supervision, but the district court overruled those objections and adopted the Report and Recommendation. Doc. 166 at 24 (301).

The court noted that it could impose a sentence of up to three years' imprisonment and that Rolle's advisory guidelines' range was 33 to 36 months' imprisonment. Doc. 166 at 24–26 (301). Dickerson left the sentence to "the discretion of the Court" but asked the court to "run any term of incarceration concurrently with the terms of incarceration in the most recent case." Doc. 166 at 25 (301). In response, the United States noted that the guidelines advise the court to run a sentence imposed for a supervised-release violation consecutively to any other term of imprisonment and asked the court to impose a consecutive 33-month term of imprisonment. Doc. 166 at 25 (301).

The court said that it rarely imposed a concurrent sentence for a supervised-release violation because that would make the violation "somewhat meaningless." Doc. 166 at 26 (301). After taking into consideration the "rather substantial sentence" that the court had just imposed, the court imposed an additional consecutive 24-month sentence for the supervised-release violation. Doc. 166 at 26 (301). Dickerson filed notices of appeal on Rolle's behalf the next day. Doc. 142 (301); Doc. 127 (301).

On February 15, the district court's grievance committee issued its Report and Recommendation with respect to Dickerson's conduct. *See* Addendum A to Rolle's brief at 119. Because of Dickerson's failure to appear at two status conferences in Rolle's case, her tardiness to trial, her assistant's

28

use of a cellphone in court, her failure to timely pay the $100 fine, her failure to appear at the hearing on the order to show cause, and her deficiencies in various state-court cases, the committee concluded that "serious sanctions" were in order. *Id.* at 125. It recommended that the court refer Dickerson to the Florida Bar, suspend her from the Bar of the Middle District of Florida for 12 months, and prohibit her from taking new cases in the Middle District of Florida until she is reinstated. *Id.* at 128. The committee also recommended that Dickerson comply with numerous conditions before being reinstated. *Id.* at 128–29.

District Judge Dalton directed Dickerson to file a response to the committee's report on or before March 6, but she did not do so. *Id.* at 133. The court, therefore, adopted the Report and Recommendation in its entirety on March 18 and imposed the sanctions that the committee had recommended.[6] *Id.* at 134–35.

### *Standard of Review*

I.    This Court reviews de novo the legal question of whether a defendant had raised a structural-error ineffective-assistance-of-counsel issue

---

[6]At the time of the filing of this brief, the Florida Bar's website indicates that Dickerson is a member in good standing and eligible to practice law in Florida.

subject to a presumption of prejudice. *See, e.g., Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1286–88 (11th Cir. 2013) (reviewing de novo whether presumption of prejudice established by *United States v. Cronic*, 466 U.S. 648, 658 (1984), applied).

II.    This Court reviews for clear error a district court's factual findings at sentencing and reviews de novo a district court's application of the sentencing guidelines. *United State v. Gonzalez*, 71 F.3d 819, 836 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).

## Summary of the Argument

I.    Although Rolle's counsel undoubtedly was unprofessional in some of her interactions with the court, and although the United States does not condone her conduct, no structural error occurred here because she did not entirely fail to subject the prosecution's case against Rolle to meaningful adversarial testing. She developed a defense for him and represented him through the course of three trials, with the first two ending with hung juries and mistrials. Throughout all three trials, she performed the normal functions of an attorney, challenging venire members during voir dire, giving an opening statement that set forth Rolle's defense, cross-examining government witnesses, calling defense witnesses, and presenting a closing argument. Before Rolle's sentencing hearing, she asserted factual and legal objections to the

PSR, and she pursued those objections at the sentencing hearing. Under these circumstances, Rolle could obtain relief from his convictions based on a claim of ineffective assistance of counsel only if he could show both that his counsel's performance was deficient and that her deficient performance prejudiced his defense. He has not done that—or even attempted to do that—here.

II.     Rather than stopping when an Orlando police officer activated his patrol car's lights and siren and attempted to pull him over, Rolle sped off at an "extremely high rate of speed" through a residential neighborhood. Consequently, the district court found at Rolle's sentencing hearing that he had recklessly created a substantial risk of death or serious bodily injury to another person during his flight from law-enforcement officers. That finding was not clearly erroneous, and the district court did not err by enhancing Rolle's guidelines offense level by two under USSG §3C1.2.

## Argument and Citations of Authority

### I.     Because Rolle's counsel did not entirely fail to subject the United States' case to meaningful adversarial testing, Rolle cannot show structural error in the proceedings.

As Rolle discusses in his brief and is evident from the facts discussed above, the conduct of the lawyer that Rolle retained, Nicole Dickerson, both inside and outside the courtroom, fell far below the level of professionalism

31

that any court should expect from an attorney. In his brief, Rolle contends that Dickerson's lack of professionalism so infected the fairness of his proceedings that structural error occurred, entitling him to a new trial and a new supervised-release-revocation proceeding. *See* Rolle's brief at 31–45. Although the United States certainly does not condone much of Dickerson's conduct, most of her deficiencies had nothing to do with her representation of Rolle, and the record simply does not come close to establishing the type of circumstances that would warrant the granting of relief absent a showing of actual prejudice to Rolle. Consequently, Rolle is not entitled to relief based on a claim of structural error.

To warrant relief based on an ineffective-assistance-of-counsel claim, a defendant ordinarily must show (1) that his counsel's performance was deficient and (2) that this deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The defendant asserting such a claim "bears the burden of proof regarding both deficient performance and prejudice." *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1238 (11th Cir. 2011).

In *United States v. Cronic*, 466 U.S. 648, 658 (1984), however, the Supreme Court recognized a narrow exception to *Strickland*'s prejudice requirement for circumstances "that are so likely to prejudice the accused that

32

the cost of litigating their effect in a particular case is unjustified." Observing

that the right to the effective assistance of counsel is "the right of the accused to

require the prosecution's case to survive the crucible of meaningful adversarial

testing," the Court determined that, "if counsel *entirely* fails to subject the

prosecution's case to meaningful adversarial testing, then there has been a

denial of Sixth Amendment rights that makes the adversary process itself

presumptively unreliable." *Id.* at 656, 659 (emphasis added). In the rare

circumstances in which a presumption of prejudice is warranted, it is

unnecessary to evaluate counsel's actual performance at trial. *Id.* at 662.

Applying these standards, the *Cronic* Court ultimately determined that

the circumstances of that case (affording an inexperienced transactional lawyer

only 25 days to prepare the defense for a criminal defendant in a multimillion

dollar "check kiting" scheme) did not justify a presumption of prejudice. *Id.* at

663–66. The Court therefore remanded the case to the court of appeals to

consider the defendant's case under *Strickland*'s performance-and-prejudice

analysis. *Id.* at 666–67 & n.41.

Almost two decades later, the Supreme Court in *Bell v. Cone,* 535 U.S.

685 (2002), addressed the application of *Strickland* and *Cronic* in the context of

a federal habeas corpus proceeding pursuant to 28 U.S.C. § 2254. There, the

Court determined that a state appellate court had correctly used the *Strickland*

33

performance-and-prejudice standard to evaluate a defendant's claim that his counsel had been ineffective during his sentencing hearing by failing to adduce mitigating evidence and waiving closing statement. *Bell,* 535 U.S. at 688–89, 698. *Cronic*'s presumption-of-prejudice standard, the Court said, applies only if (1) the accused has been completely denied counsel at a critical stage in the proceedings, (2) an attorney has completely failed to subject the prosecution's case to meaningful adversarial testing, or (3) "counsel is called upon to render assistance under circumstances where competent counsel very likely could not."[7] *Bell,* 535 U.S. at 696–97. Therefore, *Cronic*'s presumption of prejudice is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Florida v. Nixon,* 543 U.S. 175, 189 (2004).

Against this backdrop, this Court recently said that "[t]he *Cronic* decision limited the presumption of prejudice to cases where defense counsel '*entirely fails* to subject *the prosecution's case* to meaningful adversarial testing' in the trial or where there is 'the complete denial of counsel' at a "critical stage of [the] trial.'" *United States v. Roy,* 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc)

---

[7]As an example of the third circumstance meriting a presumption of prejudice, the Court cited *Powell v. Alabama*, 287 U.S. 45 (1932), in which nine black men charged with raping two young white women had had no access to a lawyer until the morning of the trial, leaving the lawyer no time to plan a defense. Nothing like that happened here.

(emphasis this Court's) (quoting *Cronic*, 466 U.S. at 659), *cert. denied,* 138 S. Ct. 1279 (2018). In that case, the defendant's lawyer had been absent for seven minutes during a 31.4-hour trial. *Id.* This Court noted that it had previously emphasized in *Stano v. Dugger*, 921 F.2d 1125, 1153 (11th Cir. 1991) (en banc), that the *Cronic* exception "applied 'to *only a very narrow spectrum of cases*' where 'the defendant was in effect *denied any meaningful assistance at all.*'" *Roy*, 855 F.3d at 1144 (emphasis in original). The Court held that defense counsel's brief but complete absence from trial did not meet this standard. *Id.* at 1148.

These cases establish that *Cronic*'s presumption of prejudice applies only in cases in which a defendant's counsel completely abrogated his responsibility to "'subject the prosecution's case to meaningful adversarial testing.'" *Harvey,* 629 F.3d at 1251 (quoting *Cronic,* 466 U.S. at 659). Consequently, the presumption does not apply when, in the course of advocating for his client, an attorney makes legal or strategic mistakes, is late to court, exercises questionable judgment, has a staff member who violates a local rule, or has a personal conflict of interest with a witness. *See Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) ("in cases involving mere 'attorney error,' we require the defendant to demonstrate that the errors 'actually had an adverse effect on the defense'"); *Strickland*, 466 U.S. at 693 ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to

35

be prejudicial."); *Tueros v. Greiner,* 343 F.3d 587, 597 (2d Cir. 2003) ("Purely subjective conflicts are, in fact, no more than a polite way of saying personal mistakes, a traditional type of ineffectiveness of counsel to which *Strickland* rather than [a presumption of prejudice] is routinely applied."); *Woodard v. Collins*, 898 F.2d 1027, 1028 (5th Cir. 1990) (the distinction between allegations of "bad and no lawyering is critical … because very different results flow from the label which is attached to the conduct in question"). Those are the types of errors that Rolle points to here. *See* Rolle's brief at 40–43.

And "there is no 'big error' exception to the actual prejudice requirement." *Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1288 (11th Cir. 2013). "The *Cronic* escape route around [the prejudice] requirement has only the three lanes the Supreme Court staked out in that decision, not four. If an attorney is present and contests the prosecution's case, any errors he commits are to be judged under the *Strickland* standard, which requires a showing of actual prejudice."

Dickerson most certainly was present and vigorously contesting the United States' case here. She represented Rolle at three trials and convinced at least some jurors during the first two trials that he was not guilty. Following the second mistrial, she attempted to obtain his release on bond. *See* Doc. 71 (301); Doc. 120 (301). Although the third trial resulted in Rolle's conviction,

36

Dickerson emphatically advocated for him from the beginning of that trial through the end. She exercised a challenge for cause and peremptory challenges during voir dire, Doc. 160 at 122–26 (301); presented an opening statement that laid a foundation for a defense of mistaken identity, Doc. 160 at 141–45 (301); asserted objections and cross-examined witnesses, *see generally* Docs. 160, 162, 164 (301); and called five defense witnesses to testify (two of whom testified that Rolle had reported his car stolen on the day the car had been involved in the offense conduct), Doc. 164 at 68–99 (301). In her closing argument, she tied together Rolle's mistaken-identity defense and the suggestion that the person who had stolen Rolle's car had been the actual perpetrator of the charged offenses, she noted that Rolle's fingerprints had not been found on any of the evidence recovered, and she offered an explanation for Rolle's cellphone hits on the towers near the apartment complex. *See* Doc. 164 at 135–49 (301).

Then, before Rolle's sentencing hearing, Dickerson asserted factual and legal objections to the PSR, *see* Final PSR Addendum, and she reiterated those objections at the hearing with respect to both the sentencing and the supervised-release violation, *see* Doc. 166 at 4, 24 (301). (Indeed, in Rolle's brief at page 47, he points out that his counsel "objected to the reckless endangerment enhancement paragraph in the PSR and reiterated its objection

at the sentencing hearing.") Therefore, before, during, and after the trial, Dickerson served as Rolle's advocate in the truest sense. Although she undoubtedly acted unprofessionally at times during the case, the *Cronic* presumption-of-prejudice does not apply here. *See Chanthakoummane v. Stephens*, 816 F.3d 62, 73 (5th Cir. 2016) (*Cronic* did not apply when petitioner's two attorneys had conducted through investigation, made informed strategic decisions, and called numerous witnesses).

Rolle likely asks this Court to apply a presumption of prejudice because he cannot show that he suffered any actual prejudice from Dickerson's deficiencies. Although Dickerson did fail to appear for a status conference, appeared late by telephone for a second status conference, and was late to court on both the first and the second days of Rolle's third trial, the court did not convene on any of the trial days until she was present, and she was not absent for any testimony or argument, much less for any critical stage in the proceeding.[8]

Moreover, although Rolle notes that Dickerson failed to file any pretrial motions or to call a defense expert witness to address the cell-tower evidence,

---

[8]The first day of the trial was set to begin at 9:15 a.m., Doc. 93 (301), and, although the transcript does not reveal what time Dickerson arrived, the court called the case to order at 9:35 a.m., Doc. 160 at 4 (301). The second day was supposed to begin at 8:30 a.m., *see* Doc. 160 at 201 (301), and Dickerson arrived one minute late at 8:31 a.m., *See* Doc. 162 at 4 (301).

he has not identified any meritorious motions she could have filed or what an expert witness might have testified. "If there is no bona fide defense to [a] charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic,* 466 U.S. at 656–57 n.19.

Rolle also points out that Dickerson failed to move for a judgment of acquittal at any time during the third trial, but Dickerson had already done so during Rolle's first two trials at which the United States had presented essentially the same evidence (less some new cellphone-location information that the United States had obtained for the third trial), and the district court had denied those motions. *See* Doc. 55 at 122 (301); Doc. 83 at 266 (301). Perhaps Dickerson thought that moving for a judgment of acquittal under these circumstances would have been futile, given that the evidence, viewed in the light most favorable to the United States, so clearly established that he had been the person who had thrown the gun and fentanyl out of the Sonata's window. *See generally* Statement of the Facts above. In light of the brevity with which the jury reached its guilty verdict, such a conclusion would have been entirely reasonable. Indeed, Dickerson does not even challenge the sufficiency of the evidence supporting his conviction here. Under these circumstances, Dickerson's decision not to move for a judgment of acquittal does not even constitute ineffective assistance, much less prejudicial error. *See Brewster v.*

*Hetzel*, 913 F.3d 1042, 1056 (11th Cir. 2019) ("Defense counsel, of course, need not make meritless motions or lodge futile objections.").

Rolle also points to Dickerson's filing of a bond motion on his behalf in the new case, rather than in the supervised-release-revocation case, as supposed evidence of her "questionable judgment." *See* Rolle's brief at 42. But it is hard to imagine how Dickerson's attempt to obtain Dickerson's release on bond from the court that had just declared a second mistrial and had encouraged Dickerson to move for his release constituted poor judgment. *See* Doc. 87 at 8, 12 (301). And that decision certainly did not prejudice Rolle.

Rolle also contends that, because Dickerson included on Rolle's witness list the two TAC Unit officers who testified against Dickerson during her own criminal trial and those officers' supervisor (Sergeant Whited), Dickerson had a "personal conflict of interest" that she should have brought to the court's attention. *See* Rolle's brief at 42. Although a defendant need not show actual prejudice if he shows that an actual conflict of interest adversely affected his lawyer's performance, *see Cuyler v. Sullivan,* 446 U.S. 335, 349–50 (1980), this Court has limited the applicability of the presumed-prejudice rule to conflicts of interest arising from concurrent representation of multiple defendants, *see Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 265 (11th Cir. 2013). Indeed, the Supreme Court explained in *Mickens v. Taylor*, 535 U.S. 162, 174–75

40

(2002), that, although Courts of Appeals have applied *Cuyler* "unblinkingly to all kinds of alleged attorney ethical conflicts," including "when representation of the defendant somehow implicates counsel's personal or financial interests," the "language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." (internal quotation marks omitted.)

No multiple-defendant-representation issue arose here, and Rolle has not shown that any alleged personal conflict affected Dickerson's performance. Dickerson had already been convicted and sentenced by the time of Rolle's third trial, *see* Addendum A to Rolle's brief at 70–71, so Dickerson had no reason to attempt to curry favor with any law-enforcement witness. She ended up calling only one of those witnesses to testify, Officer Avignon, and nothing about her brief questioning of him about his role in assuming a position at the perimeter of the apartment complex suggested that her prior encounter with him was affecting her performance. *See* Doc. 164 at 85–87 (301).

Rolle also cavalierly suggests at page 42 of his brief that Dickerson "appears to have behaved unethically by allowing [Dickerson's fiancée] to commit perjury for a false alibi during the first two trials." Nothing in the record, however, supports the suggestion that Dickerson intentionally suborned perjury. Indeed, after it had become clear that the United States was investigating the fiancée for having committed perjury, Dickerson refrained

41

from calling her as a witness at Rolle's third trial. *See* Doc. 164 at 98 (301).

That was a reasonable decision under the circumstances and certainly was not

one that resulted in prejudice to Rolle. And, in any event, Rolle should not get

relief from his conviction premised on his having allowed his fiancée to present

a false alibi at his other two trials.

Rolle also contends that Dickerson incorrectly argued at his sentencing

for a lower sentence based on an "upward departure" guidelines provision. *See*

Rolle's brief at 42–43. In fact, however, Dickerson requested "a downward

departure on the basis of Mr. Rolle's lack of reliance upon criminal activity to

make a living," Doc. 166 at 9 (301), and she cited USSG §5H1.9 as a basis for

that request, Doc. 166 at 11–12 (301). That section provides a basis for

requesting an appropriate sentence, although it is neither an upward nor a

downward departure provision. And Dickerson did present Rolle's mitigating

circumstances to the district court in pursuit of a sentence at the bottom of the

advisory guidelines range, which she succeeded in obtaining. *See* Doc. 166 at

9–12, 20–21 (301). To the extent that Dickerson's reference to section 5H1.9 as

a downward-departure provision constituted a mistake, that is the type of error

subject to *Strickland's* ordinary performance-and-prejudice analysis, not *Cronic*'s

presumed-prejudice analysis. *See Bell,* 535 U.S. at 697–98 (counsel's failure to

adduce mitigating evidence and waiver of closing argument "are plainly of the

same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components"). And, here, Rolle does not even assert that this mistake resulted in actual prejudice to him.

Because the record establishes that Dickerson investigated the case, developed a defense for Rolle (that twice succeeded), and advocated for him throughout the proceedings, this case is nothing like the cases on which Rolle relies at page 44 of his brief. In all of those cases, each of the attorneys abandoned his or her duty to serve as an advocate for the defendant at critical stages in the proceedings. That did not happen here.

Therefore, no structural error occurred in this case, and Rolle is not entitled to a new trial or a new supervised-release revocation hearing.

## II. The district court did not clearly err in finding at sentencing that Rolle's high-speed flight from law-enforcement officers had recklessly created a substantial risk of death or serious bodily injury to another.

Rolle contends that the district court erred in finding at his sentencing hearing that his flight from law-enforcement officers had recklessly created a substantial risk of death or serious bodily injury to another and consequently erred by increasing his guidelines offense level by two under USSG §3C1.2. *See* Rolle's brief at 45–52. But a review of the record establishes that the district court did not err here.

43

Section 3C1.2 provides that the district court should increase a defendant's guidelines offense level by two "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer[.]" USSG §3C1.2. The increase is justified when a district court finds that a defendant, by his conduct, exhibited a reckless disregard for the safety of persons who were present or potentially could have been present during his flight. *Gonzalez*, 71 F.3d at 837 (upholding application of section 3C1.2 based on high-speed car chase through residential area because defendant had "exhibited a reckless disregard for the safety of the various persons who resided on that street, as well as for the safety of those who might otherwise be present on that street").

In this case, Officer Evans testified that, when he had had tried to stop Rolle's Sonata, Rolle had not stopped but instead had "accelerated at an extremely high rate of speed." Doc. 162 at 92 (301); *see also* Doc. 55 at 12, 16 (301) (Officer Evans's testimony at the first trial); Doc. 83 at 79, 83 (301) (Officer Evans's testimony at the second trial). Officer Williams likewise testified that Rolle had fled "at a high rate of speed." Doc. 160 at 154 (301). 195; *see also* Doc. 53 at 39–40, 44, 117 (301) (Officer's Williams's testimony at the first trial); Doc. 81 at 126, 128 (301) (Officer Williams's testimony at the second trial). When Rolle had sped off, Rolle would not have known whether

44

any officers would attempt to follow him as he attempted to avoid

apprehension. Having deployed a GPS tracking device, however, the officers

elected not to engage in a high-speed pursuit but decided instead to follow

Rolle online via GPS until he had slowed down to a safer speed. Doc. 160 at

160 (301). That did not happen until Rolle was "a few miles down the road."

Doc. 160 at 161 (301). This was in a residential area where "the speed limits

are very low." Doc. 160 at 150 (301); *see also* Doc. 81 at 119–20 (301); Doc. 83

at 112 (301); Doc. 162 at 106 (301).

This Court has found that section 3C1.2 addresses this type of high-

speed flight from law-enforcement officers. *See United States v. Washington,* 434

F.3d 1265, 1268 (11th Cir. 2006) ("Driving a car at high speed in an area

where people are likely to be found constitutes reckless disregard for others'

safety," even though the offender did not collide with anyone.). Despite his

suggestion to the contrary, section 3C1.2 does not apply only if the defendant

induced officers to chase him—although a high-speed chase surely is

inherently dangerous, so is driving a car "extremely fast" in an attempt to flee

from law-enforcement officers in an area where people might be present in the

middle of the afternoon. *See United States v. Davis,* 734 F. App'x 718, 723 (11th

Cir. 2018) (section 3C1.2 enhancement properly applied where defendant

"actively attempted to flee as officers approached his vehicle, causing his tires

45

to spin and his engine to smoke"); *United States v. Pardo-Gerena,* 621 F. App'x 607, 613 (11th Cir. 2015) (section 3C1.2 enhancement properly applied where defendant drove 50 to 60 miles-per-hour on icy public road).

The district court here found that it was, *see* Doc. 166 at 7 (301), and that finding is not clearly erroneous. Although Rolle contends in his brief at pages 49 to 50 that the court's finding rested on "erroneous facts," there is no reason to assume that the court based its decision on a possible misstatement by the prosecutor rather than on the evidence adduced at three trials establishing that no chase occurred.[9] Indeed, before ruling on Rolle's objection to the section 3C1.2 enhancement, the court said, "[H]aving tried the case three times, I'm

---

[9]A review of the record suggests that what Rolle describes as "erroneous facts" more likely constitutes a transcription error by the court reporter. The transcript says that, when addressing Rolle's section 3C1.2 challenge, the prosecutor said:

> There was testimony in the case that Mr. Rolle sped away from the officers at a high rate of speed. Fortunately, in this case, because of the StarChase deployment, officers did not have to follow the defendant at that high rate of speed in order to catch up with him. But, in any event, he sped away from them at a high rate of speed, **and there was a police chase** in this case at least till the time that Mr. Rolle thought he was no longer being followed.

Doc. 166 at 5 (301) (emphasis added). Given that the prosecutor said that officers had not immediately followed Rolle but had waited to do so until he had thought that no one was following him, it seems likely that the prosecutor actually said, "[T]here was *no* police chase in this case" until he thought he wasn't being followed, rather than there was one.

well aware of the facts." Doc. 166 at 6 (301).

Under these circumstances, the district court did not err by finding that Rolle's high-speed flight had created a substantial risk of death or serious bodily injury, and, consequently, the court did not err by enhancing Rolle's guidelines offense level by two under section 3C1.2. He is not entitled to be resentenced.

## Conclusion

For these reasons, the United States requests this Court to affirm the judgments and sentences of the district court.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:    *s/ Linda Julin McNamara*
LINDA JULIN MCNAMARA
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 714887
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
linda.mcnamara@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 11,340 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was

sent by CM/ECF on October 4, 2019, to:

> JENNY L. DEVINE
> FEDERAL PUBLIC DEFENDER'S OFFICE
>
> *Counsel for Prince Toburas Rolle*

*s/ Linda Julin McNamara*
LINDA JULIN MCNAMARA
Assistant United States Attorney

gkpr/no/09/25/19

*b_Rolle, Prince_US Consolidated Brief_Final.docx*